FILED

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

99 SEP 27 AM 9: 12

U.S. DISTRICT COURT
N.D. OF ALABAMA

PARVATHI PERUMAREDDI,　　　　　}
　　　　　　　　　　　　　　　　　}
　　　Plaintiff,　　　　　　　　}
　　　　　　　　　　　　　　　　　}
v.　　　　　　　　　　　　　　　 }　　　CASE NO. CV 97-B-1898-S
　　　　　　　　　　　　　　　　　}
THE BOARD OF TRUSTEES OF　　　 }
THE UNIVERSITY OF ALABAMA　　　 }
AT BIRMINGHAM, et al.　　　　　 }
　　　　　　　　　　　　　　　　　}　　**ENTERED**
　　　Defendants.　　　　　　　 }
　　　　　　　　　　　　　　　　　　　　SEP 2 7 1999

**MEMORANDUM OPINION**

Currently before the court are defendants' Motion for Summary Judgment; plaintiff's

Motion to Compel Discovery, Motion for Extension of Time to Respond to Motion for Summary

Judgment, and Motion for Expedited Hearing; defendants' Motion to Strike Portions of the

Declaration of Dr. Steven Richey; and defendants' Motion to Strike Declarations of Dr. Diane K.

Beebe and Dr. Melessa Phillips.  Upon consideration of the record, the submissions of both

parties, the arguments of counsel, and the relevant law, the court is of the opinion that

defendants' Motion for Summary Judgment is due to be granted, plaintiff's Motion to Compel

Discovery and Motion for Extension of Time to Respond to Motion for Summary Judgment is

due to be denied, and defendants' Motions to Strike are due to be denied in part.

**I.  FACTUAL BACKGROUND AND PROCEDURAL POSTURE**

In Spring 1995, Plaintiff Parvathi Perumareddi ("plaintiff"), an Asian female from India,

was completing her final year at Nova Southeastern University's medical school.  (Pl.'s Dep. at

9-10, attached as Ex. A to Defs.' Mot. Summ. J.; Am. Compl. ¶¶ 7, 10.) During plaintiff's last semester, defendant Board of Trustees of the University of Alabama at Birmingham ("UAB"), through a national residency matching program, offered plaintiff a position in the Family Practice Department's[1] three-year residency program. (Am. Compl. ¶ 11). On or about July 1, 1995, plaintiff accepted the offer and began her residency at UAB. (*Id.*)

UAB and plaintiff memorialized their relationship in an Initial Resident Agreement, which set out the term of her appointment as one year, commencing July 1, 1995, and terminating on June 30, 1996. (Initial Resident Agreement ¶ 1, attached as Ex. 9 to Pl.'s Dep.) The Agreement contained the following provision on renewal:

> Resident [plaintiff] understands and acknowledges that this agreement expires on the date set forth in Section 1 and that Hospital [UAB] makes no commitment to renew this agreement. Reappointment and advancement of the Resident is at the discretion of the Program Director in accordance with paragraph 14.20A of the Hospital House Staff Policies and Procedures. If a decision is made not to renew this agreement at the end of its one year term, notice of such nonrenewal shall abe [sic] made in writing ninety (90) days in advance of June 30, 1996, in accordance with paragraph 14.20A of the Hospital House Staff Policies and Procedures. Each Resident who is offered a renewal of this agreement must accept such offer in writing within thirty (30) days of the date shown in the first paragraph of the renewal contract.

(*Id.* ¶ 5.)

Paragraph 14.20A of the House Staff Policies and Procedures provided, in relevant part, as follows:

> Appointments are awarded by the director of the concerned program usually on a yearly basis. Residents who are not to be reappointed at the end of the year should be so notified in writing by the program director at least 90 days in advance. Written notice of non-reappointment does not carry the right to appeal.

---

[1]Evidentiary submissions refer to the Department in various ways, including Family Medicine, Family and Community Medicine, and Family Practice. For purposes of this opinion, the Department will be referred to as Family Practice.

(House Staff Policies & Procedures ¶ 14.20A, attached as Ex. 16 to Pl.'s Dep.)

On or about October 30, 1995, UAB and the plaintiff entered into a second agreement, entitled Intern Contract. (Intern Contract, attached as Ex. 12 to the Deposition of Dr. Cynthia Moore-Sledge ("Moore-Sledge Dep."), attached as Ex. B to Defs.' Mot. Summ. J.) The Intern Contract provided that UAB would appoint plaintiff to an intern training program for twelve consecutive months beginning July 1, 1995, and ending June 30, 1996. (*Id.* ¶ A.1.) The Intern Contract further provided:

> if the Intern fails to satisfactorily pursue the educational program, then the Program Director/Director of Medical Education shall give no less than thirty (30) days prior notice to the Intern of probationary status, prior to the termination of such Intern.

(*Id.* ¶ C.3.)

When the plaintiff initially entered UAB's Family Practice program, the Program Director was Dr. William Fulcher ("Fulcher"), a male Caucasian. (Deposition of Dr. William Fulcher ("Fulcher Dep.") p. 11, attached as Ex. E to Defs.' Mot. Summ. J.) Fulcher left that position in August 1995, and was replaced on an interim basis by Dr. Michael Harrington ("Harrington"). (*Id.* at 11-12.) Defendant Dr. Cynthia Moore-Sledge ("Moore-Sledge"), a female African-American member of the Family Practice faculty, became Program Director in January 1996. (Moore-Sledge Dep. at 19.) Defendant Dr. Beverly VonDer Pool ("VonDer Pool") was also a faculty member in the Family Practice Department. (Deposition of Dr. Beverly VonDer Pool ("VonDer Pool Dep.") pp. 19-20, attached as Ex. C to Defs.' Mot. Summ. J.)

As part of her residency, plaintiff rotated into different departments at UAB hospital. Based on plaintiff's observed performance in these rotations, faculty members filled out

3

evaluations of plaintiff. Plaintiff received satisfactory to superior evaluations for most of the rotations. (*See* Submissions 2, 4, 18, 20, 22-24, 27-28, 32 in Pl.'s Evid. Sub.) These evaluations came from doctors in the Pediatrics, Cardiology, Emergency Room, and General Medicine Departments. (*Id.*)

In her own department, plaintiff received evaluations from two Family Practice faculty members, Moore-Sledge and Dr. Brenda Baumann. (Exs. 31-33, attached to Moore-Sledge Dep.) Baumann's first evaluation, completed on September 26, 1995, rated plaintiff's performance as satisfactory-to-borderline and stated that plaintiff was "[n]ot appropriately prepared to write orders or function at level of intern." (Ex. 32, attached to Moore-Sledge Dep.) Baumann's second evaluation, completed on February 15, 1996, rated plaintiff's performance as borderline and stated that Baumann did not feel that plaintiff "will be ready to start a second year of residency." (Ex. 31, attached to Moore-Sledge Dep.)

Two fellow residents in the Family Practice Department also filled out evaluations of plaintiff, rating her performance as above average to superior. (Exs. 29, 30, attached to Moore-Sledge Dep.)

According to plaintiff, during residential rounds in the Family Practice Department, Moore-Sledge intimidated plaintiff through harsh questioning. (Pl.'s Dep. at 214-224, 291-95.) The plaintiff claims that no other residents were treated the same way. (*Id.* at 222.) The chief resident at this time, Dr. Steven Richey ("Richey"), described the questioning of plaintiff by Moore-Sledge and Baumann as the harshest he had ever witnessed. (Declaration of Dr. Steven Richey, ¶ 3, Submission 7 of Pl.'s Evid. Sub.) According to plaintiff, Moore-Sledge did not curse plaintiff, call her names, touch her, scream at her, or say anything racial to plaintiff. (Pl.'s Dep. at 216-18.)

4

According to plaintiff, Dr. Faye Wilson, a fellow intern, told plaintiff in December 1995, that Moore-Sledge had told Wilson that "she would not stay in any Indian motels because they smell bad." (*Id.* at 106.) Plaintiff knows of no other alleged discriminatory remarks by Moore-Sledge. (*Id.* at 113-114.)

On January 8, 1996, Moore-Sledge issued a memorandum to plaintiff regarding an unexcused absence that occurred on January 1, 1996. (Ex. 28, attached to Pl.'s Dep.) In the memorandum, Moore-Sledge told plaintiff that if there was no acceptable reason for plaintiff's absence, it would be considered unexcused. (*Id.*) Moore-Sledge also noted that plaintiff had missed two appointments (on January 4 and 7) with her and should schedule another through the Residency Office. (*Id.*) Moore-Sledge copied Harrington on the memorandum. (*Id.*)

Plaintiff disputes the truth of the memorandum. Specifically, plaintiff claims she was not scheduled for rounds on January 1, that she kept the January 4 appointment, and that she could not keep the January 7 appointment because of an ice storm. (Pl.'s Dep. at 409-413.) Other than Harrington and the secretary who typed the letter, plaintiff does not know who else saw it. (*Id.* at 411.)

On January 26, 1996, VonDer Pool issued a one-page memorandum to Moore-Sledge regarding plaintiff's patient management skills. (Ex. 1, attached to VonDer Pool Dep.) The memorandum described a November 1995, incident involving plaintiff's treatment of a patient. (*Id.*) In the memorandum, VonDer Pool concludes that when treating the patient, plaintiff displayed an "inability to get a good patient history [and] follow orders." (*Id.*) VonDer Pool copied plaintiff on the memorandum. (*Id.*) VonDer Pool apparently wrote this memorandum at the request of Moore-Sledge in order to properly document problems with the plaintiff. (VonDer Pool Dep. at 92-94.)

5

On January 27, 1996, in response to VonDer Pool's memorandum, plaintiff issued a three-page memorandum to Moore-Sledge containing her own description of the November events. (Ex. 2, attached to VonDer Pool Dep.) Plaintiff described VonDer Pool's handling of the event as "unprofessional, offensive, and unwarranted." (*Id.* at p.3.) She also described VonDer Pool's account as "totally false and inaccurate." (*Id.*) She copied VonDer Pool, five other doctors, and the Graduate Medical Education Grievance Committee on the memorandum. (*Id.*)

On February 29, 1996, the Resident Education Committee met and decided not to renew plaintiff's contract. (Ex. 9, attached to Moore-Sledge Dep.) On the same day, Moore-Sledge told plaintiff that her contract would not be renewed. (Pl.'s Dep. at 140-42.) According to plaintiff, Moore -Sledge told plaintiff that the reason for nonrenewal was that, "We don't feel like you know enough to be a second year." (*Id.* at 141.) Plaintiff offered to "stay extra months and do extra intern rotations," and Moore-Sledge said she would look into it. (*Id.*)

Moore-Sledge memorialized the nonrenewal in a March 5, 1996, memorandum to plaintiff. (Ex. 12 attached to Pl.'s Dep.) In the memorandum, Moore-Sledge attributed the decision to the faculty as a whole, but did not give a reason for the nonrenewal. (*Id.*) Moore-Sledge also rejected plaintiff's request to stay on after the end of the contract. (*Id.*)

On April 15, 1996, Moore-Sledge issued a memorandum to plaintiff affirming the faculty's initial decision not to renew plaintiff's contract because she was "not ready to proceed to PGY2 status July 1996." (Ex. 13, attached to Pl.'s Dep.) In the memorandum, however, Moore-Sledge offered plaintiff an alternative plan. Plaintiff could complete her training at UAB if she (1) took a six-month leave of absence to strengthen her medical knowledge basis; (2) demonstrated clinical knowledge by passing both parts II and III of her National Boards; and (3)

6

understood that when she returned in January 1997, she would be subject to monthly reviews of her performance. (*Id.*) Plaintiff rejected the offer. (Pl.'s Dep. at 183-193.)

On May 21, 1996, VonDer Pool issued a memorandum to Harrington, Moore-Sledge and Baumann regarding a May 10, 1996, on-call incident involving plaintiff. (Ex. 27, attached to Pl.'s Dep.) In the memorandum, VonDer Pool described an incident in which plaintiff refused to handle a patient's call even though she was on the call schedule. (*Id.*) Plaintiff claims the events described in the letter are false. Specifically, plaintiff claims that the memorandum is a "totally wrong assessment" and "extremely maliciously written." (Pl.'s Dep. at 407, 408.) Plaintiff does not know of anybody else who received the memorandum other than Harrington, Moore-Sledge and Baumann. (*Id.* at 407.)

On May 30, 1996, Moore-Sledge wrote a formal letter to plaintiff summarizing the reasons for the nonrenewal of the contract. (Ex. 14, attached to Pl.'s Dep.) The stated reasons were:

(1)     a poor fund of medical knowledge;

(2)     poor management of patients;

(3)     plaintiff's refusal, on May 10, 1996, to answer a page from or speak to VonDer
        Pool; and

(4)     plaintiff's failure to pass Part III of her National Board examination.

(*Id.*)

On June 1, 1996, twelve residents and interns wrote a letter to the UAB Family Practice Department criticizing the nonrenewal decision. (Ex. 8, attached to Moore-Sledge Dep.) They copied twelve doctors and two other individuals on the letter. (*Id.*)

7

On June 13, 1996, in a letter marked "confidential," Moore-Sledge and two other faculty members issued a letter responding to the residents' June 1 letter. (Ex. 9, attached to Moore-Sledge Dep.) The June 13 letter stated that a June 6 meeting had been held to discuss the June 1 letter and listed eight doctors that were present, including Fulcher, Dr. Chris Portante, and Dr. Kevin Hornsby. (*Id.*.) The letter stated that after a thorough discussion the attendees reached a unanimous decision that plaintiff "is not ready to proceed to a PGY-2 level." (*Id.*) The letter stated that the same decision was made "at the Resident Education Committee meeting on February 29, 1996." (*Id.*) Attached to the June 13 letter was the April 15, 1996, letter to plaintiff offering her a chance to continue in the program under certain conditions. (*Id.*) The June 13 letter stated that plaintiff "chose not to exercise that option." (*Id.*)

Finally, the June 13 letter also stated that plaintiff "has the right to appeal this decision to the UAB Graduate Medical Education Committee." (*Id.*) According to Richey, the letter was distributed to all residents, not just the twelve who sent the June 1 letter. (Richey Decl. at ¶ 6.)

Sometime in June, plaintiff is unsure of the exact date, there was a meeting attended by Moore-Sledge, plaintiff, and some other Family Practice faculty and residents. (Pl.'s Dep. at 375-377.) According to plaintiff, incoming chief resident Dr. Kevin Hornsby brought up the topic of plaintiff's nonrenewal. (Pl.'s Dep. pp. 377-79.) Plaintiff did not object to this discussion. (*Id.* at 379-80.) According to plaintiff, Moore-Sledge stated that she knew issues concerning plaintiff were handled wrong, that the Family Practice faculty had been wrong, there was nothing to do about it now, and it wouldn't happen in the future. (*Id.* at 384.)

On July 5, 1996, plaintiff wrote to the chairman of the Graduate Medical Education Committee requesting a hearing by a review committee concerning the "improper and unfair treatment" she received as a first-year resident, including the nonrenewal of her contract. (Ex.

8

18, attached to Pl.'s Dep.) In the letter, plaintiff also expressed "concerns over a slanderous and damaging letter" that Moore-Sledge allegedly placed in plaintiff's file and attached to her state medical licensure application. (*Id.*) Plaintiff was referring to Moore-Sledge's May 30, 1996, letter summarizing the reasons for nonrenewal of plaintiff's contract. (Pl.'s Dep. at 285-86; Ex. 14, attached to Pl.'s Dep.) According to plaintiff, the letter was not sent with the licensure application to the Alabama Board of Medical Examiners. (Pl.'s Dep. at 315.)

On July 18, 1996, UAB School of Medicine Dean Harold Fallon ("Fallon") wrote plaintiff a letter responding to her July 5 letter. (Ex. 19, attached to Pl.'s Dep.) In the letter, Fallon told plaintiff that Dr. Scott Buchalter ("Buchalter"), Chief of Staff of the Hospital and Chairman of the Grievance Committee for interns and residents, would be handling her request for a hearing. (*Id.*)

According to plaintiff, Buchalter then set up a meeting with plaintiff and her attorney to discuss nonrenewal of her contract. (Pl.'s Dep. at 302.) The meeting was held thereafter, in either late July or early August. (*Id.* at 303.) At the meeting, both the plaintiff and her attorney explained to Buchalter "that [plaintiff's] contract was not renewed and that [she] didn't understand why." (*Id.*) According to plaintiff, she discussed with Buchalter specific details of the circumstances surrounding the nonrenewal. (*Id.*) They also discussed her future plans. (*Id.* at 303-305.)

One of the concerns expressed by plaintiff at the meeting with Buchalter was who would serve as a reference for plaintiff from the UAB program when she applied to other programs. (*Id.* at 305-306.) Buchalter told plaintiff she would have to trust at least one person from the department to provide such references. (*Id.*) On September 3, 1996, plaintiff, through counsel,

9

apparently designated Fulcher, the former Family Practice program director, to be that person. (Ex. 24 p. 2, attached to Pl.'s Dep.)

On the same day, plaintiff and counsel met with UAB counsel to discuss plaintiff's departure from the UAB program and possible continuation of wages and/or health benefits. (Pl.'s Dep. at 308-309.) Plaintiff did not specifically discuss reinstatement with Buchalter or the UAB attorneys. (*Id.* at 311-313.)

On August 15, 1996, plaintiff filed a Charge of Discrimination against UAB with the Equal Opportunity Employment Commission. (Ex. 10 attached to Pl.'s Dep.) In the Charge, plaintiff alleged race and national origin discrimination in that UAB, through Moore-Sledge, harassed her during her residency and did not renew her residency contract. (*Id.* at 2.)

In or about September of 1996, Plaintiff contacted the University of Mississippi to inquire into entering the second year of its Family Medicine residency program ("UM program"). (Declaration of Dr. Diane K. Beebe ("Beebe Decl.") ¶ 1, attached as Submission 25 in Pl.'s Evid. Sub.) UM program protocol requires that the residency director (at that time Dr. Beebe ("Beebe")) contact the previous residency director prior to finalizing an offer to an applicant who has received training elsewhere. (*Id.* ¶ 2.) Pursuant to this protocol, in November 1996, Beebe contacted UAB and eventually spoke with plaintiff's designated reference choice, Fulcher. According to Beebe, Fulcher "indicated some negative thoughts about [plaintiff], including that some faculty felt that [she] had deceived them." (*Id.*) According to Beebe, this delayed plaintiff's admission to the UM program by four months, until March 1997. (*Id.*)

On July 24, 1997, plaintiff filed this lawsuit. On November 17, 1997, this court entered a scheduling order setting the discovery cutoff for July 31, 1998, and the dispositive motion

10

deadline for August 31, 1998. (Sched. Ord. ¶¶ 2, 10.) Attached to the scheduling order was the

court's Exhibit A, which states, in relevant part:

> The opponent shall file with the clerk all evidentiary materials in opposition to the
> motion not later than 21 days [after the filing of the motion for summary
> judgment]. The opponent's brief must be submitted to the court on the day the
> evidentiary materials are filed.
>
> . . .
>
> The movant's reply brief shall be submitted to the court not later than 10 days
> after the date on which the opponent's responsive submission was due.

(Sched. Order. Ex. A ¶¶ A.2 and A.3.)

On January 5, 1998, plaintiff filed an Amended and Restated Complaint alleging that:

• UAB and Moore-Sledge violated Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. § 1981, and 42 U.S.C. § 1983 in that they discriminated against plaintiff based on her

race and national origin by refusing to renew her contract (Counts 1, 2, and 4);[2]

• UAB and Moore Sledge violated 42 U.S.C. § 1981 in that they improperly interfered

with plaintiff's application to the UM program (Count 3);

• UAB and Moore-Sledge violated the Fourteenth Amendment in that they did not

provide plaintiff with due process when declining to renew her contract (Count 5);

• UAB and Moore-Sledge violated plaintiff's right to privacy by distributing the June 13

memorandum (with the April 15 memorandum attached) to all residents and by discussing

private and confidential information regarding the plaintiff in the June meeting attended by

faculty and residents (Counts 6 and 7);

---

[2]In her Amended and Restated Complaint, plaintiff labels each count with roman
numerals (I, II, III, *etc.*). The court, however, will refer to the counts using arabic numerals (1, 2,
3, *etc.*).

11

• UAB and Moore-Sledge intentionally or recklessly caused emotional and physical anguish and distress to plaintiff through their conduct toward plaintiff throughout her residency (Counts 8 and 9);

• UAB and Moore-Sledge defamed plaintiff by distributing the June 13 memorandum to all residents, attaching the May 30 letter to plaintiff's licensure application, publishing (through Dr. Fulcher) false statements regarding plaintiff to the UM program, and by issuing the January 8 memorandum regarding the January 1 hospital rounds (Counts 10, 11, 12 and 15); and

• VonDer Pool defamed plaintiff by publishing the January 26 memorandum regarding November events and the May 21 memorandum regarding May 10 on-call events (Counts 13 and 14). (Am. Compl. ¶¶ 23-72.)

On August 31, 1998, defendants filed a motion for summary judgment on all counts. (Mot. Summ. J.) On September 18, 1998, seven weeks after the discovery cutoff, plaintiff filed a Motion to Compel Discovery, Motion for Extension of Time to Respond to Motion for Summary Judgment, and Motion for an Expedited Hearing. (Pl.'s Mot. to Compel.) In this filing, plaintiff asked the court to compel production of (1) a summary of the scores of all family practice residents from July 1, 1993 to present on the in-training exam; (2) redacted copies of any and all evaluations of other family practice residents reflecting "below borderline or satisfactory" performance or deficiency in medical knowledge; and (3) any reprimands of Moore-Sledge and VonDer Pool. (*Id.*) Plaintiff also requested the court to extend the deadline to respond to defendants' motion for summary judgment and for an expedited hearing on the motion to compel. (*Id.*)

On September 24, 1998, plaintiff filed a Rule 56(f) Response to Defendants' Motion for Summary Judgment. (Pl.'s Rule 56(f) Resp. to Defs.' Mot. Summ. J.) In the Rule 56(f)

12

response, plaintiff claimed that because defendants had not produced the documents listed in the September 18 Motion to Compel, plaintiff could not respond to all matters raised in defendants' Motion for Summary Judgment. (*Id.* ¶ 2.) Plaintiff thus concluded that the Motion for Summary Judgment was due to be denied, or continued pending further discovery. (*Id.*)

On September 28, 1998, twenty-eight days after defendants filed their motion for summary judgment, plaintiff filed her opposition brief and evidentiary submission. (Pl.'s Prelim. Resp. to Defs.' Mot. Summ. J. Pending Rule 56(f) Issues ("Pl.'s Opp."); Pl.'s Evid. Sub. in Support of Prelim. Resp. ("Pl.'s Evid. Sub.").) Included in the evidentiary submission were the Declaration of Dr. Steven Richey ('Richey Declaration"), the Declaration of Dr. Diane K. Beebe ("Beebe Declaration"), and the Declaration of Dr. Melessa Phillips ("Phillips Declaration"). (Submissions 7, 25, and 34 in Pl.'s Evid. Sub.)

On October 8, 1998, defendants filed their reply brief and two Motions to Strike. The first motion was to strike portions of the Richey Declaration as conclusory, inadmissible, irrelevant or immaterial. (Defs.' Mot. to Strike Portions of Decl. of Dr. Steven Richey.) The second motion was to strike in their entirety the Beebe and Phillips declarations as irrelevant, misleading, confusing, and inappropriate. (Defs.' Mot. to Strike Decls. of Dr. Diane K. Beebe and Dr. Melessa Phillips ¶¶ 1-2.) Further, defendants claimed that the Beebe and Phillips Declarations were inadmissible as either unidentified expert testimony or, in the alternative, opinion testimony from lay witnesses. (*Id.* at ¶¶ 3, 5.) Finally, defendants argued that the two declarations were inadmissible because any probative value was far outweighed by prejudice to the defendants. (*Id.* ¶ 4.)

## II. DISCUSSION

**A.    Plaintiff's Motion to Compel Discovery, Motion for Extension of Time and Motion for Expedited Hearing, and Rule 56(f) Response to Defendants' Motion for Summary Judgment**

### 1.    *Plaintiff's Motion to Compel*

As noted, plaintiff has requested the court to compel production of (1) a summary of the scores of all family practice residents from July 1, 1993 to present on the in-training exam; (2) redacted copies of any and all evaluations of other family practice residents reflecting "below borderline or satisfactory" performance or deficiency in their fund of medical knowledge; and (3) any reprimands of Moore-Sledge and VonDer Pool. (Pl.'s Mot. to Compel.)

A discovering party may move the court for an order to compel a party to comply with Rule 26(a) disclosure requirements or with a Rule 34 request for inspection. *See* Fed. R. Civ. P. 37(a)(2)(A) and (B). Federal Rules of Civil Procedure 37(a)(2)A) and (B) both require that a motion to compel "must include a certification that the movant has in good faith conferred or attempted to confer" with the person or party failing to provide the documents at issue "in an effort to secure [the documents] without court action." *Id.*

In support of her motion to compel, plaintiff has provided the court with a Declaration by plaintiff's counsel Michael K. Abernathy. (Declaration of Michael K. Abernathy ("Abernathy Decl."), attached to Pl.'s Mot. to Compel.) In the declaration, Abernathy states that (1) defendants failed to supplement their Rule 26(a) disclosures and thus have not complied with Rule 26(e); (2) plaintiff's counsel agreed to let plaintiff be deposed first but defendants held up discovery by delaying plaintiff's deposition for several months; (3) once plaintiff's deposition was taken defendants were slow in providing defense witnesses for deposition; (4) during deposition of defense witnesses it became apparent that they could not recall any test scores or

14

evaluations of other residents, so such documents became relevant; (5) plaintiff's counsel sent a letter to defense counsel on July 31, 1998, requesting the relevant documents; and (6) defense counsel never responded to the letter. (*Id.* and attached Exs.). The statements set forth in this declaration also provide the basis for plaintiff's Rule 56(f) Response to the Motion for Summary Judgment. (Pl.'s Rule 56(f) Resp. to Defs.' Mot. Summ. J. and attached Exs.)

Plaintiff's arguments are without merit. Plaintiff has failed to meet the requirements of Federal Rules of Civil Procedure 37(a)(2)(A) and (B), and the court finds that plaintiff's Motion to Compel is due to be denied. The court's decision is based on several factors.

First, plaintiff has failed to show that defendants did not make a disclosure required by Rule 26(a). Federal Rule of Civil Procedure 37(a)(2)(A) only comes into play when "a party fails to make a disclosure required by Rule 26(a)." Fed. R. Civ. P. 37(a)(2)(A).  Local Rule 26.1(a)(1)(B) only requires a party to disclose documents that "may be used by it (other than solely for impeachment purposes) to support its contentions with respect to any significant factual issue in the case." LR 26.1(a)(1)(B). Defendants did not rely on the requested documents to support any of their contentions. Consequently, plaintiff has failed to show the court that disclosure of such documents was required by Rule 26(a).

Second, plaintiff never filed a motion to compel production of defense witnesses. If defendants were intentionally dilatory in deposing plaintiff, plaintiff's counsel would have been well-advised to depart from any agreement with the defendants, notice the deposition of defense witnesses, and, if defendants did not produce such witnesses, file motions to compel. Plaintiff knew that there was a discovery deadline in this case. If defendants' actions were unduly delaying discovery, plaintiff should have *timely* moved the court to intervene.

15

Third, plaintiff never filed any interrogatories in this case. Once it became clear that the depositions of defense witnesses were being pushed back, plaintiff still had the option to file interrogatories. Such interrogatories, timely served and responded to, may have revealed any deficiencies in the defendants' recollections and the consequent need to undertake further written discovery.

Fourth, plaintiff never timely filed any requests for production. On July 31, 1998, plaintiff faxed a letter to defendants requesting the three categories of documents that are the subject of this Motion to Compel. (Ex. 1 to Pl.'s Mot. to Compel.) Under the scheduling order, defendants were then entitled to 30 days to respond to such requests, making such responses due on or about August 30. (Sched. Ord. ¶ 4). The Scheduling Order specifically states that "[a]ll discovery is to be commenced in time to be *completed* by July 31, 1998." (*Id.* at ¶ 2) (emphasis supplied). Therefore, even if plaintiff's letter was considered a formal request for production under Rule 34, such discovery was not commenced in time to be completed on July 31, 1998, and, thus, was not timely. *Williams v. Little Rock Mun. Waterworks*, 155 F.R.D. 188, 188 (E.D. Ark. 1993) (holding that defendant would not be compelled to respond to discovery requests that were not propounded in time for responses to be due before discovery cutoff), *aff'd*, 21 F. 3d 218 (8th Cir. 1994).

Plaintiff had over eight months to conduct discovery in this case. She neglected to request allegedly necessary documents until the day of discovery cutoff. Her motion to compel is due to be denied.

### 2. *Plaintiff's Motion for Extension of Time and Motion for Expedited Hearing*

In conjunction with her Motion to Compel, plaintiff requested this court to extend her deadline to respond to the Motion for Summary Judgment. The basis for the Motion to Extend

16

was, presumably, that plaintiff would need time to analyze any produced documents and
incorporate them into her response.

In its November 17, 1997, Scheduling Order, this court stated that:

> **EXTENSIONS FOR THE DEADLINES SET FOR DISCOVERY CUTOFF
> AND DISPOSITIVE MOTIONS WILL NOT BE EXTENDED ABSENT
> EXTRAORDINARY GOOD CAUSE SHOWN.** This means it is highly
> unlikely that a Motion to Extend Discovery or the Date for Filing Dispositive
> Motions will be granted.

(Sched. Ord. ¶ 1) (bold and caps in original). The plaintiff has failed to meet her burden of
showing "extraordinary good cause" and her motion is due to be denied.

Since the court did not immediately rule on her motion, however, plaintiff's Preliminary
Response to Defendant's Motion for Summary Judgment, filed one week after the deadline, is
deemed timely filed. Similarly, defendants' Reply Brief, filed three days after it was due, is
deemed timely filed.

Given the foregoing analysis of plaintiff's Motion to Compel, the court is of the opinion
that plaintiff's Motion for an Expedited Hearing is due to be denied as moot.

### 3. *Plaintiff's Rule 56(f) Response*

In her Rule 56(f) Response, plaintiff argues, in effect, that she would have been able to
develop responses to defendant's proffered legitimate, nondiscriminatory reasons for nonrenewal
if she had more time to conduct discovery. (Pl.'s Rule 56(f) Resp. to Defs.' Mot. Summ. J.)
Repeating the arguments set forth in her Motion to Compel, plaintiff claims she was prevented
from developing the evidentiary basis for such responses during the scheduled discovery period.
(*Id.* and attached Exs.)

17

Federal Rule of Civil Procedure Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).

"Subsection (f) allows a party who has no specific material contradicting his adversary's presentation to survive a summary judgment motion if he presents valid reasons justifying his failure of proof." *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F. 2d 1313, 1316 (11th Cir. 1990) (citation and quotations omitted).

Before entering summary judgment the district court must ensure that the parties have an adequate opportunity for discovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As noted, plaintiff had eight months (from scheduling order to discovery cutoff) to conduct discovery in this case. Moreover, plaintiff's counsel has been involved in this case since July 1996, more than enough time to familiarize himself with the issues at hand and map out a comprehensive discovery strategy. Plaintiff, however, did not request any production of documents until the day of discovery cutoff. Consequently, this court is of the opinion that plaintiff has not "present[ed] valid reasons justifying [her] failure of proof." *Florida Power & Light,* 893 F. 2d at 1316.

## B.    Defendants' Motions to Strike

As noted, on October 8, 1998, defendants filed a motion to strike portions of the Richey Declaration. (Defs.' Mot. to Strike Portions of Decl. of Dr. Steven Richey.) On the same day, defendants filed a motion to strike in their entirety the Beebe and Phillips Declarations. (Defs.' Mot. to Strike Decls. of Dr. Diane K. Beebe and Dr. Melessa Phillips.)

18

To the extent that any of the challenged testimony is relevant to the court's analysis, the court will deal with these motions below, in its discussion of the Motion for Summary Judgment.

## C.   Defendants' Motion for Summary Judgment

### 1.   Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

19

**2.      Title VII, Section 1981 and Section 1983 Claims Relating to the Nonrenewal of Plaintiff's Contract**

Plaintiff claims that UAB and Moore-Sledge violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981, and 42 U.S.C. § 1983 in that they discriminated against plaintiff based on her race and national origin by refusing to renew her contract.[3]  (Am. Compl. Counts 1,2, and 4, ¶¶ 23-28, 32-34.) Although plaintiff concedes that Moore-Sledge is not subject to individual liability under Title VII, she contends that due to Moore-Sledge's bad faith actions, Moore-Sledge is not immune to individual liability in the § 1981 and § 1983 claims. (Pl.'s Opp. at 22-23.)

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In any action alleging disparate treatment by an employer, the plaintiff must prove the employer acted with a discriminatory motive. *Int'l Bd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). To establish a *prima facie* case of discrimination, a plaintiff may employ direct, statistical, or circumstantial evidence. *Verbreaken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989). Plaintiff concedes that this case rests on circumstantial evidence,

---

[3]Because the proper allocation of burdens of proof based on a Section 1983 claim is the same for a case based on Title VII, the court need not address the Section 1983 claim separately from the Title VII claim. *Richardson v. Leeds Police Dept.,* 71 F.3d 801, 805 (11th Cir. 1995); *Cross v. State of Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995). In both instances, plaintiff must prove that the defendants acted with discriminatory intent. *Richardson,* 71 F.3d at 805. Similarly, the Eleventh Circuit has held that the elements of a disparate treatment claim are identical under Title VII and 42 U.S.C. §1981. *Vance v. Southern Bell Telephone & Telegraph Co.*, 863 F.2d 1503, 1509 n.3 (11th Cir. 1989).

mitigating any need for a direct evidence or statistical evidence analysis. (Pl.'s Prelim. Resp. to Defs.' Mot. Summ. J. ("Pl.'s Opp.") p. 20.)

When a plaintiff's evidence is circumstantial, the Supreme Court has developed a three-stage framework for evaluating the strength of the plaintiff's proof and plaintiff's ability to withstand a defendant's motion for summary judgment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must establish a *prima facie* case by proving that (1) she is a member of a protected class; (2) she applied and was qualified for a job for the position at issue; (3) despite her qualifications, she was rejected; and (4) the defendant gave the position to a person who was not a member of a protected class. *McDonnell Douglas,* 411 U.S. at 802. Second, once the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for not awarding the position to the plaintiff. *Clark v. Coates & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993). If the employer does so, the burden shifts back to the plaintiff to "introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Id.* at 1228; *see also Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence).

### a.   Prima Facie Case

Defendants argue that plaintiff "is unable to make a prima facie case under the MacDonald-Douglas [sic] framework because she cannot show she was qualified to move forward to her second year of residency." (Def's Brief in Support of Mot. Summ. J. ("Defs.' Brief") p. 17.) In response, plaintiff offers a host of evaluations and declarations setting forth her qualifications. (*See, e.g.*, Submissions 2, 4, 6, 18, 20-24, 27-28, 32 in Pl.'s Evid. Sub.) Having examined the evidence, the court finds that there is a genuine issue of material fact as to whether

plaintiff was qualified for the second year program.  Defendants do not challenge any other elements of the plaintiff's *prima facie* case.  Consequently, the court finds that plaintiff has met her low initial burden of establishing a *prima facie* case.[4]

### b.   Legitimate Nondiscriminatory Reasons

Since plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for not renewing plaintiff's contract.  *Clark,* 990 F.2d at 1227.  "This 'burden of proof' is to be understood as a burden of production, not persuasion."  *Busby v. City of Orlando*, 931 F.2d 764, 777 n.12 (11th Cir. 1991)(citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989)).  Defendant is not required at this juncture to prove absence of discriminatory motive, or even to persuade the court that the reasons proffered actually motivated its decision.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993).  On the other hand, "[i]f the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted" and "drops from the case."  *Burdine,* 450 U.S. at 255; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  "A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence."  *Burdine*, 450 U.S. at 256 n.10.

In support of the nonrenewal decision, defendants proffer several legitimate, nondiscriminatory reasons for the adverse action: (1) personal observations of the faculty; (2)

---

[4]There is no doubt that the plaintiff was a member of two protected classes - national origin (Indian) and race (Asian).  Further, plaintiff suffered an adverse employment action, nonrenewal of her contract denying her advancement to the second year of her residency.  Given the nature of the adverse employment action at issue, however, it is unlikely that the replacement prong is applicable to this case.  *See McDonnell Douglas*, 411 U.S. at 802 n. 13 ("The facts necessarily will vary in Title VII cases, and the specification [] of the *prima facie* proof required from respondent is not necessarily applicable in every respect to differing factual situations.")

rotation evaluations received on plaintiff; (3) plaintiff's academic, in-training exam and national boards performances; (4) plaintiff's handling of patient management issues; and (5) plaintiff's poor fund of medical knowledge. (Defs.' Brief at 17-18; Defs.' Reply Brief in Supp. Mot. Summ. J. ("Defs.' Reply") pp. 2-3.) Defendants also note that they acted within the terms of plaintiff's contract, which left renewal to the discretion of Moore-Sledge, and that the faculty supported Moore-Sledge's decision. (Defs.' Brief at 17-18.)

Upon review of the evidence, the court finds ample documentation and testimony supporting these proffered reasons. (Exs. 31-33 attached to Moore-Sledge Dep. (evaluations of Moore-Sledge and Baumann); Ex. 28 attached to Pl.'s Dep. (Moore-Sledge memorandum regarding unexcused absence and missed meetings); Ex. 1 attached to VonDer Pool Dep. (VonDer Pool memorandum regarding plaintiff's patient management skills); Pl.'s Dep. at 141 (Moore-Sledge telling plaintiff reason for nonrenewal was lack of knowledge); Ex. 12 attached to Pl.'s Dep. (Moore-Sledge memorandum attributing decision to the faculty as a whole); Ex. 13 attached to Pl.'s Dep. (Moore-Sledge memorandum stating plaintiff was "not ready to proceed to PGY2 status July 1996"); Ex. 27 attached to Pl.'s Dep (VonDer Pool memorandum regarding May 10, 1996, on-call incident involving plaintiff); Ex. 14 attached to Pl.'s Dep. (Moore-Sledge letter to plaintiff summarizing reasons for the nonrenewal); Ex. 9 to Moore-Sledge Dep. (Moore-Sledge letter stating that at a June 6 meeting eight members of the Family Practice faculty had reached a unanimous decision that plaintiff "is not ready to proceed to a PGY-2 level").

In her deposition, however, Moore-Sledge testified that the basic reasons for nonrenewal were plaintiff's poor fund of medical knowledge, evaluations by the faculty, impressions of the faculty from having worked with her, and patient-management issues. (Moore-Sledge Dep. at 318.) She further stated that plaintiff's performance in medical school and on her in-training

23

exam supported the decision, but was not used in making the decision. (*Id.* at 318-320.) She also stated that, despite its inclusion in the May 30 letter listing reasons for dismissal, plaintiff's May 10 on-call incident was not a factor in the nonrenewal decision. (*Id.* at 371-74.)

Based on this evidence and testimony, the court finds that defendants have met their burden of production in proffering the following legitimate nondiscriminatory reasons: (1) personal observations of the faculty; (2) rotation evaluations received on plaintiff; (3) plaintiff's handling of patient management issues; and (4) plaintiff's poor fund of medical knowledge. Based on the testimony of Moore-Sledge, however, the court will not consider plaintiff's medical school, in-training exam and national boards performances as reasons for the nonrenewal.

### c. Pretext

If the employer carries its burden of production, the burden shifts back to the plaintiff to "introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Burdine*, 450 U.S. at 255; *Howard v. BP Oil Co.*, 32 F.3d 520, 525 (11th Cir. 1994). A plaintiff's prima facie case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *See Combs*, 106 F.3d at 1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). Thus, at this third level of analysis, plaintiff has the burden of proving that the defendants' explanations are pretext for discrimination.

Plaintiff claims that defendants' proffered reasons are pretextual because: (1) some faculty members did not agree with the decision; (2) plaintiff received good evaluations from doctors other than Moore-Sledge and Baumann; (3) other residents whose contracts were

24

renewed scored low on their in-training exam; (4) the cited incidents of poor patient management skills were not true; (5) other doctors did not witness poor patient management skills by the plaintiff; and (6) other residents were not required to pass Part III of their boards prior to beginning their second year of residency. (Pl.'s Opp. at 21-22.) The court will address each argument in turn.

Faculty support. Moore-Sledge's June 13, 1996, memorandum indicates that both the Resident Education Committee (on February 29, 1996) and eight other doctors (on June 6, 1996) agreed with the nonrenewal decision. (Ex. 9, attached to Moore-Sledge Dep.) In her statement of facts, plaintiff contends that Fulcher was not at the June 6 meeting, Dr. Chris Portante abstained from the June 6 voting, and it is "doubtful" that Dr. Kevin Hornsby would support the decision. (Pl.'s Opp. at 7-8, 13.)

An examination of the evidence cited by plaintiff, however, reveals that the evidence does not support plaintiff's contentions. Fulcher testified that he was not at the February meeting, but did attend the June 6 meeting. (Fulcher Dep. at 33, 75-76, attached as Ex. E to Defs.' Mot. Summ. J.) He does not recall details of the meeting. (*Id.* at 75-77.) Portante testified he did not recall whether he was at the June 6 meeting. (Portante Dep. at 57-59, attached as Ex. L to Defs.' Mot. Summ. J.) Moore-Sledge thinks Portante was there but may have abstained. (Moore-Sledge Dep. at 397-402.) Finally, plaintiff cites no evidence that supports her contention that Hornsby voted against the decision. The court cannot infer from his signature on the residents' June 1 letter what his later actions were at the June 6 meeting.

Because there is no evidence that Family Practice faculty members disagreed with the decision, plaintiff's attempt to show pretext fails.

25

Plaintiff's good evaluations. As noted above, plaintiff has presented a host of good evaluations and other evidence regarding her qualifications. Plaintiff's qualifications, however, are not in dispute. At this level of the burden-shifting analysis, the court need not consider the truth of plaintiff's good and bad evaluations. It need only decide whether Moore-Sledge's reliance on the bad evaluations was a pretext for discriminatory behavior. *Elrod v. Sears, Roebuck and Co.*, 939 F. 2d 1466, 1470 (11th Cir. 1991) ("Our inquiry is limited to whether the employer gave an honest explanation of its behavior.") (collecting cases); *see also Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir.1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981.").

Plaintiff received numerous good evaluations from doctors outside the Family Practice Department. (*See, e.g.*, Submissions 2, 4, 6, 18, 20, 22-24, 27-28 in Pl.'s Evid. Sub.) With some exceptions, Moore-Sledge did not know the doctors filling out these evaluations. (Moore-Sledge Dep. at 109, 126, 130, 131-32, 136, 137-38, 140, 144, 147, 148-49, 152, 155.)

Fulcher, who previously held the position of Family Practice Residency Program Director, testified that such rounds evaluations are not the only criteria used when considering renewal of a resident's contract. (Fulcher Dep. at 108-109.) In plaintiff's case, there was also negative feedback from some members of the Family Practice faculty and general concerns about her fund of knowledge. (*Id.*)

Plaintiff received two good evaluations from fellow Family Practice residents. (Submissions 7, 21 in Pl.'s Evid. Sub.) Moore-Sledge testified that it was not Family Practice Department policy to let residents fill out evaluations on each other. (Moore-Sledge Dep. at

26

157.) She also testified that she did not give much credence to these two evaluations. (*Id.* at 157-59, 172-73.)

In the final analysis, defendants have presented the following undisputed facts. First, the Resident Education Committee (on February 29, 1996) and eight other faculty members (on June 6, 1996) supported, or at least did not disagree with, Moore-Sledge's nonrenewal decision. Second, other Family Practice faculty members documented concerns with plaintiff's performance. Baumann specifically stated that plaintiff was not ready to proceed to her second year of residency. (Ex. 31, attached to Moore-Sledge Dep.) Plaintiff puts forth no evidence that Baumann's evaluation was pretext for unlawful discrimination.

Therefore, given the concerns raised about plaintiff by faculty members in the Family Practice Department, the court cannot say that it was unreasonable, or pretextual, for Moore-Sledge to rely on those concerns rather than on the evaluations of other doctors and plaintiff's fellow residents. *Elrod*, 939 F. 2d at 1470 (noting that "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions" and that the key inquiry is "whether the employer gave an honest explanation of its behavior").

In-training scores. Former chief resident Dr. Steven Richey states that he has personal knowledge that other residents in plaintiff's class scored low on the in-training class but nonetheless had their contracts renewed. (Submission 7 ¶ 4 attached to Pl.'s Evid. Sub.)[5] Assuming for summary judgment purposes that this statement is true, such residents are not proper comparators. There is no evidence that such residents had records with problems similar

---

[5]In their Motion to Strike, Defendants challenge this statement as too vague because it doesn't name specific residents. (Defs.' Mot. to Strike Portions of Richey Decl.) The court finds that as to this portion of Richey's Declaration, defendants' Motion to Strike is due to be denied.

to plaintiff's, *i.e.* interpersonal conflicts with faculty, patient management issues, and a poor fund of medical knowledge.[6] Moreover, as noted, plaintiff's in-training scores supported the nonrenewal decision, but was not a factor in making the decision. (Moore-Sledge Dep. at 318-320.)

Poor patient management skills. The court need not delve into the relative truth of the memorandums issued regarding plaintiff's handling of patients. Regardless of their truth, as discussed above, plaintiff has not shown that it was unreasonable for Moore-Sledge and other faculty to rely on such memorandums.

Other doctors did not witness poor patient management skills. As noted above, the court cannot say that it was unreasonable, or pretextual, for Moore-Sledge to rely on the observations of faculty within her own department over the observations of other doctors or plaintiff's fellow residents.

Other residents were not required to pass Part III of their boards. Even if this is true, such residents are not proper comparators. There is no evidence that such residents had records with problems similar to plaintiff's, *i.e.* interpersonal conflicts with faculty, patient management issues, and a poor fund of medical knowledge.

There is other evidence in the record that the court must consider in this pretext analysis: (1) Moore-Sledge's harsh questioning of plaintiff; (2) Moore-Sledge's alleged remark regarding Indian-owned hotels; and (3) Moore-Sledge's inconsistent remarks regarding the importance of the in-training exam and the May 10 on-call incident with VonDer Pool.

---

[6]The court recognizes plaintiff's Rule 56(f) argument that further discovery could produce such evidence. The court has dealt with this issue above.

Harsh questioning. According to plaintiff and Richey, during residential rounds in the
Family Practice Department, Moore-Sledge questioned plaintiff harsher than any other resident
in the program. (Pl.'s Dep. at 291-98; Richey Decl ¶ 3,[7] Submission 7 in Pl.'s Evid. Sub.)
According to plaintiff, however, Moore-Sledge did not curse plaintiff, call her names, touch her,
scream at her, or say anything racial to plaintiff. (Pl.'s Dep. at 216-18.) Drawing all reasonable
inferences in favor of the plaintiff, the court finds that the questioning was unjustified.
Nevertheless, even assuming that Moore-Sledge's harsh questioning constitutes some evidence
of pretext, it is insufficient evidence from a which a reasonable jury could find that the reasons
articulated by the defendants for the nonrenewal decision were pretext for unlawful
discrimination based on national origin or race.

Indian-owned hotel remark. According to plaintiff, Dr. Faye Wilson, a fellow intern, told
plaintiff in December 1995, that Moore-Sledge had told Wilson that "she would not stay in any
Indian motels because they smell bad." (Id. at 106.) Even if it were admissible,[8] the court finds
that such remark, standing alone or in conjunction with plaintiff's other arguments, is insufficient
evidence from a which a reasonable jury could find that the reasons articulated by the defendants
for the nonrenewal decision were pretext for unlawful discrimination based on national origin or
race.

---

[7]There are two paragraphs labeled "3" in the Richey Declaration. Defendants challenge
this ¶ 3 "because it contains conclusory statements, and does not set forth facts as would be
admissible in evidence." (Defs.' Mot. to Strike Portions of Richey Decl. ¶ 1.) The court finds
that as to this portion of Richey's Declaration, defendants' Motion to Strike is due to be denied.

[8]This remark appears to be inadmissible double hearsay. The first link, from Moore-
Sledge to Wilson, has an exception in that if it were relevant, it would be an admission of a party
opponent. The second link, however, from Wilson to plaintiff, has no apparent exception,
rendering the statement inadmissible. Inadmissible evidence cannot be considered at the
summary judgment stage. Fed. R. Civ. P. 56(e).

Inconsistent reasons. As noted, in her deposition, Moore-Sledge testified that plaintiff's performance on her in-training exam and plaintiff's May 10 on-call incident were not used in making the nonrenewal decision. (Moore-Sledge Dep. at 318-20, 371-74.) This seems to contradict the plain language of the May 30 letter. In her deposition, Moore Sledge explained, however, that these incidents were listed because they seemed to buttress the conclusions that plaintiff had a poor fund of medical knowledge and had patient management problems. (*Id.*) Given that explanation, the letter and testimony can be reconciled as consistent explanations rather than contradictory. Thus, Moore-Sledge's re-characterization of the stated reasons for plaintiff's dismissal is insufficient evidence from a which a reasonable jury could find that the reasons articulated by the defendants for the nonrenewal decision were pretext for unlawful discrimination based on national origin or race.

### d. Conclusion

Plaintiff has failed to put forth sufficient evidence on which a reasonable jury could conclude that the reasons articulated by the defendants for the nonrenewal decision were pretext for unlawful discrimination based on national origin or race. Summary judgment is due to be granted on all counts (1, 2 and 4) related to the nonrenewal of plaintiff's contract.[9]

---

[9]Plaintiff concedes that Moore-Sledge is not subject to individual liability under Title VII. (Pl.'s Opp. p. 22) Plaintiff contends, however, that Moore-Sledge did not act in good faith and that there was an issue of fact as to her articulated legitimate, nondiscriminatory reasons. Consequently, plaintiff argues that Moore-Sledge is not immune to individual liability in the § 1981 and § 1983 claims. (*Id.* at 22-23.) Although the court has found that there is no viable discrimination claim based on the nonrenewal decision, the issue of Moore-Sledge's immunity will be dealt with below.

### 3.    Section 1981 Claim Relating to Plaintiff's Application to the UM Program

Plaintiff claims that UAB and Moore Sledge violated 42 U.S.C. § 1981 in that they improperly interfered with plaintiff's application to the UM program.  (Am. Compl Count 3, ¶¶ 29-31.)  Defendants move for summary judgment on this and other § 1981 and § 1983 claims based on UAB's sovereign immunity under the Eleventh Amendment.  (Defs.' Brief at 19-20.) The plaintiff concedes UAB's immunity.  (Pl.'s Opp. at 22.)

### a.    In What Capacity was Moore-Sledge Sued?

Defendants contend that because Moore-Sledge is sued in her official capacity, she is entitled to sovereign immunity.[10]  (Defs.' Brief at 19-20.)  The plaintiff responds, however, that she "has presented sufficient evidence that the reasons cited by [d]efendants for their actions towards [p]laintiff are not legitimate and not in good faith."  (Pl.'s Opp. at 22.)  Consequently, plaintiff argues, Moore-Sledge is not immune from liability in the § 1981 and § 1983 claims. (*Id.*)

Whereas defendants argue that Moore-Sledge is sued in her official capacity, plaintiff invokes the "good faith" analysis from the qualified immunity defense, which is available only in cases where officials are sued in their personal or individual capacity.  *Lundgren v. McDaniel*, 814 F. 2d 600, 604 ("Qualified immunity – the objective 'good faith' defense – is available only in a personal capacity lawsuit, not in an official capacity action." ) (citation omitted).  The complaint does not expressly state whether Moore-Sledge is sued in her official or individual

---

[10]Defendants also claim (and plaintiff contests) that VonDer Pool is immune from suit under §§ 1981 and 1983.  The court has thoroughly examined the Amended and Restated Complaint and finds no § 1981 or § 1983 claims against VonDer Pool.

capacity. (Am. Compl.) Defendants and plaintiff, then, seem to be at odds over the capacity in
which Moore-Sledge is sued.

The Supreme Court has stated that "[i]n many cases, the complaint will not clearly
specify whether officials are sued personally, in their official capacity, or both. 'The course of
proceedings' in such cases typically will indicate the nature of the liability sought to be
imposed." *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985) (quoting *Brandon v. Holt*, 469
U.S. 464, 469 (1985)); *accord Lundgren v. McDaniel*, 814 F. 2d 600, 604 (11th Cir. 1987).
Thus, where the complaint fails to specify the capacity in which the government official is sued,
the courts look to the substance of the pleadings, the relief sought, and the course of the
proceedings in order to determine whether the suit is based on individual or official liability.
*Biggs v. Meadows*, 66 F. 3d 56, 59 (4th Cir. 1995); *see also Hobbs v. Roberts*, 999 F. 2d 1526,
1528-32 (11th Cir. 1993) (examining the insurance policy at issue, the language in the pleadings,
jury instructions and post-trial remarks in deciding that defendants were sued in both individual
and official capacities).

Defendants argue that Moore-Sledge is sued only in her official capacity because the
complaint identifies Moore-Sledge as "residency director of the UAB [Family Practice
Department]." (Defs.' Brief at 19-20; Am. Compl. ¶ 9.) Although the plaintiff failed to specify
that she was suing Moore-Sledge in both her official and individual capacities, the pleadings and
the course of litigation suggest that the plaintiff was doing so.

First, the plaintiff has sued all of the defendants for punitive damages, which are not
available against the state or state officials acting in their official capacity. Second, defendants
specifically pleaded affirmative defenses of both Eleventh Amendment and qualified immunity,
indicating that they thought Moore-Sledge was being sued in both her official and individual

32

capacities. (Answer.)  In light of these factors, the Court finds that "the plaintiff's intention to hold [the] defendant[s] personally liable can be ascertained fairly." *Biggs*, 66 F.3d at 61.

### b.    **Moore-Sledge's Immunity**

Having determined that plaintiff meant to sue Moore-Sledge in both her official and individual capacities, the court turns to the merits of the arguments presented.  As to the claims against Moore-Sledge in her official capacity, the court finds the motion for summary judgment is due to be granted for Counts 2, 3, and 4.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983.");  *Jett v. Dallas Independent Sch. Dist.*, 492 U.S. 701, 730 (1989) (holding that § 1981 lawsuits against government actors are subject to the same limitations as § 1983 lawsuits).

As discussed above, there is no claim against Moore-Sledge in her individual capacity in Count 1, because individual liability does not lie under Title VII.  Further, the court found that summary judgment was due on Counts 2 and 4 against Moore-Sledge in her individual capacity because the defendants had legitimate, nondiscriminatory, non-pretextual reasons for the nonrenewal decision.

To the extent Moore-Sledge is sued in her individual capacity in Count 3, defendants have not moved for summary judgment based on Moore-Sledge's qualified immunity, even though Moore-Sledge appears to have such immunity.  The court, however, will not require the parties to brief and address this issue because it is clear from the evidence presented that defendant Moore-Sledge is entitled to judgment as a matter of law on this count on the merits.

####   c.      **Count 3 on the Merits**

Count 3 alleges that defendant UAB, "through the actions of Dr. Fulcher, violated the

contractual rights of the Plaintiff, as protected by 42 U.S.C. § 1981, by improperly interfering

with the Plaintiff's application to the University of Mississippi Medical Center for admission to

their [sic] residency program, and exhibiting continued discrimination toward the Plaintiff based

on her race and national origin, in communicating false and misleading information to the

Residency Director of the University of Mississippi Medical Center Residency Program." (Am.

Compl. ¶ 30.) Although the count contains no allegations against Moore-Sledge that would

subject her to liability, the addendum clause of this count seeks damages against Moore-Sledge

as well as UAB.

There is no evidence before the court that Moore-Sledge had any personal contact with

the UM program regarding plaintiff's application for admission. Further, there is no evidence

before the court that Moore-Sledge influenced Fulcher in any way in his communication with the

UM program. Because plaintiff has not put forth sufficient evidence to create a genuine issue of

material fact as to whether Moore-Sledge violated plaintiff's rights under § 1981, defendant

Moore-Sledge is entitled to judgment as a matter of law on Count 3.

####   4.      *Due Process Claim Against UAB and Moore-Sledge*

Plaintiff alleges that UAB and Moore-Sledge violated the Fourteenth Amendment in that

they did not provide plaintiff with due process when declining to renew her contract. (Am.

Compl. Count 5, ¶¶ 35-37). Although not pled as a § 1983 claim, due process claims can only be

brought through 42 U.S.C. § 1983. Consequently, UAB and Moore-Sledge in her official

capacity are entitled to summary judgment based on Eleventh Amendment sovereign immunity.

*See, e.g., Harden v. Adams*, 760 F. 2d 1158, 1163-64 (11th Cir. 1985) (*en banc*). Moore-Sledge

34

is liable in her individual capacity, however, unless plaintiff was afforded her due process rights. *Id.* at 1166-67 (holding that genuine issue of material fact existed as to whether a school official responsible for termination violated plaintiff's due process rights).

**a.     Plaintiff's Position: Student or Employee?**

When considering plaintiff's due process claims, the court must first turn to the unique questions raised by the plaintiff's position. Both the plaintiff and the defendants cite cases pertaining to due process rights of students who are academically dismissed. Yet the plaintiff pleads a Title VII claim (Count 1), which only applies in employment settings.

This is an important distinction because the due process rights of academically dismissed students are different than the due process rights of dismissed state employees. The burdens of procedural due process are lighter in cases of academic dismissal than in cases of employment discharge. *Compare Bd. of Curators, Univ. Of Mo. v. Horowitz*, 435 U.S. 78, 85-87 (1978) (holding that formal hearings are not required in cases of academic dismissal, but only a decision making process which is careful and deliberate) *with Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-46 (1985) (holding that a tenured public employee is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story").

Moreover, there are some substantive due process rights for academically dismissed students, whereas there are no such rights for pretextually terminated state employees. *Compare Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225-28 (1985) (holding that decisions in an academic setting are subject to a narrow avenue of judicial review under a substantive due process standard) *with McKinney v. Pate*, 20 F. 3d 1550, 1560 (11th Cir. 1994) ("our prior

decisions, which granted pretextually terminated employees section 1983 causes of action premised on substantive due process violations, are contrary to Supreme Court jurisprudence").

Very few courts have considered the issue of whether a postgraduate position carries with it the due process rights of students or employees. One court found an issue of fact regarding plaintiff's due process claims without ever reaching the question of what kind of process, if any, was due. *Banerjee v. Roberts*, 641 F. Supp. 1093, 1103 (D. Conn 1986). One court assumed, without analysis, that the postgraduate plaintiff's dismissal should be treated as an academic dismissal for purposes of due process. *Rossomando v. Bd. of Regents of the Univ. of Neb.*, 2 F. Supp. 2d 1223, 1228-30 (D. Neb. 1998). Two courts assumed, without analysis, that the postgraduate plaintiff's dismissal should be treated as an employment discharge for purposes of due process analysis. *Ong v. Tovey*, 552 F. 2d 305, 307-308 (9th Cir. 1977); *Stretten v. Wadsworth Vet. Hosp.*, 537 F. 2d 361, 367-369 (9th Cir. 1976).

Two courts, however, specifically analyzed the issue of whether a resident in a postgraduate medical program receives the procedural process due a student or the process due an employee. Both found that a resident was due more process than an academically dismissed student. *Ezekwo v. NYC Health & Hospitals Corp.*, 940 F. 2d 775, 786 (2d Cir. 1991) (holding that hospital that passed over resident for chief resident position "should have informed [the resident] of the basis for its action and should have provided her with an opportunity to respond to its concerns before a final decision was made"); *Navato v. Sletten*, 560 F. 2d 340, 345 (8th Cir. 1977) (holding that a resident who was placed on probation should have received notice and a hearing).

The *Ezekwo* court specifically noted that "[w]hile a medical residency program is largely an academic undertaking, it is also an employment relationship." *Ezekwo*, 940 F. 2d at 785. The

employment relationship is "evidenced by the existence of formal employment contracts." *Id.*
The court thus concluded that "some form of pre-deprivation process" was due. *Id.*

Similarly, in this case, the plaintiff's residency, although largely an academic
undertaking, is also an employment relationship. The plaintiff received a salary (called a
"stipend") paid out in monthly installments and "subject to Federal and State withholding taxes."
(Offer Letter, attached as Ex. 5 to Pl.'s Dep. ("Offer Letter").) The plaintiff also received health
and professional liability insurance, as well as fifteen days annual vacation. (*Id.*) The
relationship was formalized in an Initial Resident Agreement closely resembling an employment
contract. (Initial Resident Agreement, attached as Ex. 9 to Pl.'s Dep.) Finally, UAB specifically
noted that residents were prohibited from moonlighting because "[r]esidents are considered full-
time employees." (Offer Letter at p. 2.)

### b. Procedural Due Process

Based on the evidence before the court, the court finds that the procedural due process
claim should be analyzed under the framework set forth for pretextually terminated state
employees. Such employees are entitled to "'some kind' of pre-termination hearing."
*McKinney*, 20 F. 3d at 1561 (quoting *Loudermill*, 470 U.S. at 546).[11] "That hearing is not a mini-
trial and 'need not definitely resolve the propriety of the discharge. It should be an initial check
against mistaken decisions – essentially, a determination of whether there are reasonable grounds
to believe that the charges against the employee are true and support the proposed action.'" *Id.*

---

[11]Of course, the threshold question in a due process argument is whether the plaintiff has
a constitutionally protected property or liberty interest. *Board of Regents v. Roth*, 408 U.S. 564,
569-70 (1972). A person claiming a property interest in a benefit "must have more than an
abstract need or desire for it . . . . He must . . . have a legitimate claim of entitlement to it." *Id.* at
577. Although the court is not sure whether plaintiff had a property interest in the renewal of a
one-year contract, defendant concedes the issue in this case. (Defs.' Brief at 20.)

(quoting *Loudermill*, 470 U.S. at 545-46.) The state may cure a procedural deprivation by providing a later procedural remedy. *Id.* at 1557. "[O]nly when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *Id.*

Plaintiff challenges the procedure of her dismissal on three grounds. First, she was not placed on thirty days probation prior to her termination, as provided by her Intern Contract. (Pl.'s Opp. at 23; Intern Contract ¶ C.3, attached as Ex. 12 to Moore-Sledge Dep.) Second, she was not allowed an appeal of the nonrenewal decision, even though the June 13, 1996, letter said she had such a right. (Pl.'s Opp. at 23; Ex. 9 to Moore-Sledge Dep.) Third, the meetings with Buchalter and UAB counsel reviewing the nonrenewal decision did not occur until after plaintiff's termination. (Pl.'s Opp. at 23-24.)

Defendants move for summary judgment based on the reasoning that meetings with Buchalter and UAB counsel afforded her all the process she was due. (Defs.' Brief at 20-22.) This court agrees. The court bases its decision on several factors.

First, defendants cured any procedural deprivation by providing a subsequent procedural remedy. Plaintiff asked for a hearing on the nonrenewal decision. The defendants provided her such a hearing. The timing of the hearing does not lead to a procedural due process violation. Although defendants provided no pre-deprivation hearing, they never "refuse[d] to provide a process sufficient to remedy the procedural deprivation." *McKinney*, 20 F. 3d at 1557. Instead, defendants granted her request for such a review. Upon review of the plaintiff's accounts of the meeting, (Pl.'s Dep. at 302-305), the court finds that the hearing was an appropriate "initial check against mistaken decisions – essentially, a determination of whether there are reasonable

grounds to believe that the charges against the employee are true and support the proposed action." *McKinney*, 20 F. 3d at 1561.

Second, notice of the hearing is not an issue. Plaintiff received a plethora of correspondence outlining the reasons for the nonrenewal decision. She then requested a hearing on the nonrenewal decision. (Ex. 18 attached to Pl.'s Dep.) Defendants responded with a letter and a phone call that such a hearing would be held with Buchalter appointed to review the decision. (Ex. 19 attached to Pl.'s Dep.; Pl.'s Dep. p. 302.) Thus, plaintiff had sufficient written and oral notice of the hearing and its subject.

Third, plaintiff mistakenly relies on the 30-day probationary notice mentioned in the intern contract and the appeal mentioned in the June 13, 1996, letter. Such documents do not provide the standards for due process. Only federal constitutional standards provide such guidance. *Bailey v. Bd. of Cty Comm'ers of Alachua Cty, Fla.*, 956 F. 2d 1112, 1122 (11th Cir. 1992) ("In answering that question [of what process was due], we note that neither the personnel policies of Alachua County nor the state law of Florida provides the answer. Rather, federal constitutional standards determine what process [plaintiff] was due.") (citing, *inter alia*, *Loudermill*, 470 U.S. at 541.) Departure from the provisions of the intern contract or other terms and conditions of employment are simply not relevant to constitutional due process standards.[12]

In summary, while the procedures used by defendants to terminate plaintiff's residency may not have been the best possible, under *McKinney* and *Loudermill* the procedures satisfied the basic requirements of due process.

---

[12]There is no breach of contract claim in this case.

39

### c.    **Substantive Due Process**

Turning to plaintiff's substantive due process claim, the court must once again consider plaintiff's position to determine her substantive due process rights. Plaintiff's residency has both employment and academic characteristics. Consequently, this court analyzed the procedural due process claim under the slightly more stringent requirements afforded pretextually terminated state employees.

If the court treated plaintiff as a pretextually terminated employee for purposes of the substantive due process claim, however, she would have no claim. *McKinney*, 20 F. 3d at 1560. Given the undeniable academic nature of plaintiff's position at UAB, the court is unwilling to deprive plaintiff of any substantive due process rights. Therefore, the court must analyze the substantive due process claim under the standard set forth for academic dismissals.

"When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225; *accord Haberle v. Univ. of Ala. in B'ham*, 803 F. 2d 1536, 1540 (11th Cir. 1986).

Defendants argue that the faculty decision in this case was based upon their professional opinions of plaintiff's performance and was therefore appropriate under the circumstances. This court agrees. As noted, it is undisputed in this case that in two separate meetings faculty voted in support of the nonrenewal decision. Further, the decision was based on faculty evaluations and other documents outlining legitimate concerns about plaintiff's performance. Based on such

evidence, the court finds that the nonrenewal decision "rested on academic judgment that is not beyond the pale of reasoned academic decision making." *Ewing*, 474 U.S. at 227-28.

### d.   Conclusion

For the foregoing reasons, the court finds that plaintiff's claims against defendants UAB and Moore-Sledge relating to violations of due process (Count 5) are due to be denied.

### 5.   *State Law Claims against UAB, Moore-Sledge and VonDer Pool*

Plaintiff alleges that UAB and Moore-Sledge violated plaintiff's right to privacy by distributing the June 13 memorandum (with the April 15 memorandum attached) to all residents and by discussing private and confidential information regarding the plaintiff in the June meeting attended by faculty and residents (Counts 6 and 7); UAB and Moore-Sledge intentionally or recklessly caused emotional and physical anguish and distress to plaintiff through their conduct toward plaintiff throughout her residency (Counts 8 and 9); UAB and Moore-Sledge defamed plaintiff by distributing the June 13 memorandum to all residents, attaching the May 30 letter to plaintiff's licensure application, publishing (through Dr. Fulcher) false statements regarding plaintiff to the UM program, and by issuing the January 8 memorandum regarding the January 1 hospital rounds (Counts 10, 11, 12 and 15); and VonDer Pool defamed plaintiff by publishing the January 26 memorandum regarding November events and the May 21 memorandum regarding May 10 on-call events.  (Am. Compl. ¶¶ 23-72.)

### a.   Immunity

Defendants move for summary judgment based on the absolute immunity of UAB and its employees and the discretionary immunity of the individual plaintiffs.  (Defs.' Brief at 23-25.) Plaintiff concedes the absolute immunity of UAB but contends that Moore-Sledge and VonDer Pool are not immune from suit because the state law claims are based not on the nonrenewal

41

decision, but rather on "separate acts by the individual [d]efendants which damaged [p]laintiff." (Pl.'s Opp. at 25.)

### i.     *Absolute Immunity*

Under Article I, § 14 of the Alabama Constitution, "[s]tate officers and employees, in their official capacities and individually, [] are absolutely immune from suit when the action is, in effect, one against the state. *Ala. State Docks v. Saxon*, 631 So. 2d 943, 946 (Ala. 1994). When determining whether an action is in effect one against the state, courts consider the nature of the action and the type of relief sought. *Nance by Nance v. Matthews*, 622 So. 2d 297, 300 (Ala. 1993). If the employee is named as a defendant because of his/her individual action, not because of his/her official position as employer, then absolute immunity does not apply. *See Coleman v. City of Dothan*, 598 So. 2d 873, 875 (Ala. 1992) (holding that sheriff was absolutely immune because he was not present when deputies allegedly committed torts).

In this case, it is clear that Moore-Sledge and VonDer Pool are sued based on their individual actions. Consequently, absolute immunity does not apply.

### ii.     *Qualified (Discretionary Function) Immunity*

Article I, § 14 of the Alabama Constitution also extends to state employees "acting within the general scope of their authority in performing functions that involve a degree of discretion." *Ex parte Davis*, 721 So. 2d 685, 688 (Ala. 1998). "Discretionary acts are defined as those acts to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise of judgment and choice and involving what is just and proper under the circumstances." *Id.* (internal quotations and citation omitted). "A state officer or employee is not protected by discretionary immunity if in performing his discretionary functions he willfully, maliciously, fraudulently, or in bad faith injures someone." *Id.*

In this case, the plaintiff challenges several actions by the individual defendants: Moore-Sledge's distribution of the June 13 memorandum to all residents; Moore-Sledge's discussing private and confidential information regarding the plaintiff in the June meeting attended by faculty and residents; Moore-Sledge's harsh questioning of plaintiff throughout her residency; Moore-Sledge's attaching the May 30 letter to plaintiff's licensure application; Moore-Sledge's issuing the January 8 memorandum regarding the January 1 hospital rounds; VonDer Pool's issuing the January 26 memorandum regarding November events; and VonDer Pool's May 21 memorandum regarding May 10 on-call events.

The court finds that the actions challenged in plaintiff's state law claims are discretionary in nature under the qualified immunity doctrine. *See Ex parte Davis*, 721 So. 2d at 689 (noting that warden's referral of inmate to medical facility and deputy warden's refusal to let inmate keep appointments were discretionary acts); *Ex parte Ala. Dep't of Forensic Sciences*, 709 So. 2d 455, 458 (Ala. 1998) (holding that medical examiner's decision to use rented refrigeration unit was discretionary act); *Grant v. Davis*, 537 So. 2d 7, 9 (Ala. 1988) (holding that State Highway Department engineer's failure to inspect, repair and maintain part of highway system was discretionary act).

Further, the court sees no evidence in the record that Moore-Sledge or VonDer Pool acted "willfully, maliciously, fraudulently, or in bad faith." *Ex parte Davis*, 721 So. 2d at 689. The memorandums distributed were commonplace documentation of a resident's performance. The questioning of plaintiff, while severe, does not rise to the level of bad faith. *See id.* at 689 (holding that deputy warden's actions in denying inmate medical care did not rise to the level of bad faith). Consequently, Moore-Sledge and VonDer Pool are entitled to qualified immunity from all state law claims.

**b.** **On the merits**

Even in the absence of immunity, the court finds that there are no genuine issues of material fact as to the state law claims.

### *i.* *Invasion of Privacy*

In her invasion of privacy claims, plaintiff challenges the distribution of the June 13 memorandum to all residents and the discussion held in the June meeting (Counts 6 and 7). The tort of invasion of privacy consists of four distinct subtorts: (1) wrongful intrusion upon plaintiff's physical solitude or seclusion; (2) publicity which violates ordinary decencies; (3) putting the plaintiff in a false, but not necessarily defamatory position in the public eye; and (4) the appropriation of some element of plaintiff's personality for a commercial use. *Phillips v. Smalley Maint. Serv.*, 435 So. 2d 705, 708 (Ala. 1983). The fourth subtort is clearly inapplicable to this case.

The second and third subtort contain the elements of publicity and putting the plaintiff in the public eye. The Alabama Supreme Court has recently stated that:

> Publicity . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches or is sure to reach, the public.
>
> Thus it is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.

*Johnston v. Fuller*, 706 So.2d 700, 703 (Ala. 1997) (citing and quoting Restatement (Second) of Torts § 652D cmt. a (1977)) (internal quotations omitted) (ellipses in original).

44

There has been no such publicity in this case, thus subtorts two and three are inapplicable. *See Pouncy v. Vulcan Materials Co.* , 920 F. Supp. 1566, 1584 n. 9 ("Neither does [defendant's] alleged disclosure of [plaintiff's] private affairs to other employees qualify as 'publication'")

The remaining subtort in an invasion of privacy claim is wrongful intrusion upon the plaintiff's physical solitude or seclusion. In *Phillips*, the Alabama Supreme Court adopted the Restatement (Second) of Torts definition of the wrongful intrusion branch of the invasion of privacy tort. *Phillips*, 435 So. 2d at 708-09. In *Johnston*, the Court specifically set out the definition:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Johnston*, 706 So. 2d at 702 (citing Restatement (Second) of Torts § 652B (1977))

In *Johnston*, the Court further noted that "[t]he defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." *Id.* (citing and quoting § 652B cmt. c).

> The Court went on to state that:

> The wrongful intrusion may be by physical intrusion into a place where the plaintiff has secluded himself, by discovering the plaintiff's private affairs through wiretapping or eavesdropping, or by some investigation into the plaintiff's private concerns, such as opening private mail or examining a private bank account . . . . Further, if the means of gathering the information are excessively objectionable and improper, a wrongful intrusion may occur.

*Id.* (internal citations omitted).

Plaintiff in this case has failed to allege that the defendants entered her home, searched through her private papers, wiretapped her telephone, or eavesdropped on her conversations.

Plaintiff did not allege that the defendants wrongfully obtained private records concerning her affairs. Plaintiff failed to present any evidence that defendants' conduct in gathering any information was abrupt, offensive, and objectionable. *See id.* (dismissing wrongful intrusion claim because of plaintiff's failure to show such actions).

Consequently, the court finds that plaintiff's invasion of privacy claims (Counts 6 and 7) fail as a matter of law and summary judgment is due to be granted.

### ii. *Outrage and Intentional Infliction of Emotional Distress*

Plaintiff's claims of outrage and intentional infliction of emotional distress (Counts 8 and 9) are based on UAB and Moore-Sledge's conduct toward plaintiff throughout her residency. Defendants argue, and plaintiff concedes, that outrage and intentional infliction of emotional distress are the same tort. (Defs.' Brief at 29; Pl.'s Opp. at 29.)

The Alabama Supreme Court has defined the tort as follows:

> [O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress must be so severe that no reasonable person could be expected to endure it.

*Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981).

In other words, the plaintiff must show (1) that the defendants' conduct was intentional or reckless; (2) that it was extreme and outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it. *Thomas v. BSE Industrial Contractors, Inc.*, 624 So.2d 1041, 1043 (Ala. 1993) (citing *Inmon*, 394 So. 2d at 365). The *Inmon* test is applied strictly, allowing an outrage claim to go to the jury only in egregious cases. *Ex parte Crawford & Co.*, 693 So. 2d 458, 459 (Ala. 1997).

46

In *Inmon*, the Alabama Supreme Court clarified the second element by stating:

> Any recovery must be reasonable and justified under the circumstances, liability
> ensuing only when the conduct is extreme . . . .  By extreme we refer to conduct
> so outrageous in character and so extreme in degree as to go beyond all possible
> bounds of decency, and to be regarded as atrocious and utterly intolerable in a
> civilized society.

394 So.2d at 365 (citation omitted).

In this case, plaintiff claims that during residential rounds in the Family Practice

Department, Moore-Sledge intimidated her through harsh questioning.  (Pl.'s Dep. at 291-98.)

The plaintiff describes the questioning as harassing and intimidating.  (*Id.*)  Richey, the chief

resident at this time, describes the questioning of plaintiff by Moore-Sledge and Baumann as the

harshest he had ever witnessed.  (Richey Decl., ¶ 3, Submission 7 of Pl.'s Evid. Sub.)  According

to plaintiff, Moore-Sledge did not curse plaintiff, call her names, touch her, scream at her, or say

anything racial to plaintiff.  (Pl.'s Dep. at 216-18.)

The court finds that the challenged actions fall far short of "conduct so outrageous in

character and so extreme in degree as to go beyond all possible bounds of decency, and to be

regarded as atrocious and utterly intolerable in a civilized society."  *Inmon,* 394 So.2d at 365; *see*

*also Ex parte Crawford*, 693 So. 2d at 460-61 (collecting cases setting the threshold for such

extreme behavior).  Consequently, the court finds that summary judgment is due to be granted on

plaintiff's claims of outrage and intentional infliction of emotional distress (Counts 8 and 9).

### iii.    *Defamation*

Plaintiff claims UAB and Moore-Sledge defamed plaintiff by distributing the June 13

memorandum to all residents, attaching the May 30 letter to plaintiff's licensure application,

publishing (through Dr. Fulcher) false statements regarding plaintiff to the UM program, and by

issuing the January 8 memorandum regarding the January 1 hospital rounds (Counts 10, 11, 12

47

and 15).  Plaintiff further claims that VonDer Pool defamed plaintiff by publishing the January

26 memorandum regarding November events and the May 21 memorandum regarding May 10

on-call events (Counts 13 and 14).  As noted, plaintiff has conceded Count 12, which concerns

Dr. Fulcher's statements to the UM program.  (Pl.'s Opp. at 26.)

> To prevail in a defamation action, the plaintiff must show:

> 1) a false and defamatory statement concerning the plaintiff;  2) an unprivileged
> communication of that statement to a third party;  3) fault amounting to at least
> negligence on the part of the defendant;  and 4) either actionability of the
> statement irrespective of special harm or the existence of special harm caused by
> the publication of the statement.

*McCaig v. Talladega Pub. Co.*, 544 So. 2d 875, 877  (Ala. 1989) (citation omitted).

The court finds that Counts 13, 14 and 15 (concerning VonDer Pool's January 26

memorandum regarding November events, VonDer Pool's May 21 memorandum regarding May

10 on-call events, and Moore-Sledge's January 8 memorandum regarding the January 1 hospital

rounds) all fail due to the conditional privilege afforded reports to managers and employees

whose duties include the handling of such reports.  *Cantrell v. North River Homes, Inc.*, 628 So.

2d 551, 553 (Ala. 1993); *K-Mart Corp. Inc. v. Pendergrass*, 494 So. 2d 600, 604 (Ala. 1986).

The court finds that Count 11 (Moore-Sledge's attaching the May 30 letter to the

licensure application) fails because there was no publication.  Plaintiff admits that it was

removed from the licensure application and therefore not sent to third parties.  (Pl.'s Opp at 26;

Pl.'s Dep. at 315.)  Consequently, there was no publication.

Finally, the court finds that Count 10, concerning the distribution of the June 13

memorandum to all residents, fails because there were no false and defamatory statements.  The

June 13 letter stated that a June 6 meeting had been held to discuss the June 1 letter and lists

eight doctors that were present, including Fulcher, Portante and Hornsby.  (Ex. 9 to Moore -

Sledge Dep.) The letter stated that after a thorough discussion the attendees reached a unanimous decision that plaintiff "is not ready to proceed to a PGY-2 level." (*Id.*) The letter stated that the same decision was made "at the Resident Education Committee meeting on February 29, 1996." (*Id.*) Attached to the June 13 letter was the April 15, 1996, letter to plaintiff offering her a chance to continue in the program under certain conditions. (*Id.*) The June 13 letter stated that plaintiff "chose not to exercise that option." (*Id.*) The letter was distributed to all residents, not just the twelve who sent the June 1 letter. (Richey Decl. at ¶ 6.)[13]

Plaintiff contends that the letter was false because Fulcher was not at the June 6 meeting, Dr. Chris Portante abstained from the June 6 voting, and it is "doubtful" that Dr. Kevin Hornsby would support the decision. (Pl.'s Opp. at 7-8, 13.) Evidence cited by the plaintiff, however, does not support her contentions.

Fulcher testified that he was not at the February meeting, but did attend the June 6 meeting. (Fulcher Dep. pp 33, 75-76, attached as Ex. E to Defs.' Mot. Summ. J.) He does not recall details of the meeting. (*Id.* at 75-77.) Portante testified he did not recall whether he was at the June 6 meeting. (Portante Dep. at 57-59, attached as Ex. L to Defs.' Mot. Summ. J.) Moore-Sledge thinks Portante was there but may have abstained. (Moore-Sledge Dep. at 397-402.) Finally, plaintiff cites no evidence that supports her contention that Hornsby voted against the decision. The court cannot infer from his signature on the residents' June 1 letter what his later actions were at the June 6 meeting.

---

[13]In their Motion to Strike, Defendants challenge this statement because "it is conclusory in nature and further attempts to state legal conclusions." (Defs.' Mot. to Strike Portions of Richey Decl.) Although it is not clear from the face of the declaration whether Richey had direct knowledge of this distribution, the defendants do not challenge the declaration on those grounds. Therefore, the court finds that as to this portion of Richey's Declaration, defendants' Motion to Strike is due to be denied.

There was no false and defamatory information in the document.  Consequently, the court finds that summary judgment is due to be granted on Count 10.

### III.  CONCLUSION

The court concludes that there is no genuine issue as to any material fact, and defendants are entitled to a judgment as a matter of law.  Plaintiff has failed to meet her burden to "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Consequently, the court holds that defendants' Motion for Summary Judgment is due to be granted on all counts.  An order granting defendants' Motion for Summary Judgment will be entered contemporaneously with this Opinion.

**DONE** this 27th day of September, 1999.

**SHARON LOVELACE BLACKBURN**
United States District Judge

50